UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
UNITED STATES OF AMERICA


            v.                                    No. 17-CR-630 (ER)
                                            **FILED UNDER SEAL**


AAMER ABDULAZIZ AHMED SALMAN,


                        Defendant.
----------------------------------------------------------X




## SENTENCING MEMORANDUM ON BEHALF OF
## AAMER ABDULAZIZ AHMED SALMAN




Marc Agnifilo
Zach Intrater
AGNIFILO INTRATER LLP
445 Park Avenue, 7th Fl.
New York, NY 10022
(646) 205-4350

*Counsel for Defendant*
*Aamer Abdulaziz Ahmed Salman*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................... 2

I.   MR. ABDULAZIZ VOLUNTARILY TRAVELED FROM DUBAI TO NEW YORK TO
     SURRENDER AND COOPERATE WITH THE GOVERNMENT IN THE ABSENCE
     OF AN EXTRADITION TREATY ................................................................................. 4

II.  MR. ABDULAZIZ'S COOPERATION REGARDING ONECOIN CONSPIRATORS
     WAS TIMELY AND SIGNIFICANT ............................................................................ 7

III. ███████████████████████████████████████████████████
     ████████████████████████████████████████████.........11

IV.  MR. ABDULAZIZ WAS NOT INVOLVED IN THE UNDERLYING ONECOIN
     SCHEME ........................................................................................................................ 12

V.   THE NEED TO PREVENT UNWARRANTED SENTENCING DISPARITIES
     SUPPORTS A BELOW-GUIDELINES SENTENCE ..................................................... 13

VI.  MR. ABDULAZIZ'S CHARACTER AND REPUTATION WITHIN THE
     COMMUNITY ............................................................................................................... 18

VII. THE COLLATERAL CONSEQUENCES MR. ABDULAZIZ'S FAMILY FACES
     DUE TO HIS ABSENCE WEIGH IN FAVOR OF A BELOW-GUIDELINES
     SENTENCE .................................................................................................................... 33

VIII. THE DISPARATE TREATMENT THAT MR. ABDULAZIZ FACES AS A NON-
     CITIZEN WEIGHS IN FAVOR OF A BELOW-GUIDELINES SENTENCE ............ 35

IX.  MR. ABDULAZIZ'S AGE AND HEALTH WEIGH IN FAVOR OF A BELOW-
     GUIDELINES SENTENCE ........................................................................................... 41

X.   THE NEED FOR SPECIFIC AND GENERAL DETERRENCE DOES NOT WARRANT
     ADDITIONAL INCARCERATION ............................................................................. 43

CONCLUSION ...................................................................................................................... 47

## PRELIMINARY STATEMENT

Defendant Aamer Abdulaziz Ahmed Salman, through counsel, respectfully submits this Sentencing Memorandum to assist this Court in determining an appropriate sentence following Aamer's guilty plea to conspiracy to commit money laundering, in violation of Title 18 U.S.C. § 371.

For the following reasons, we ask the Court to sentence Mr. Abdulaziz to a sentence substantially below the Guidelines and the five-year maximum sentence. First, when he learned there was a sealed indictment in this district, he retained counsel in New York, reached out to the prosecutors here and ultimately voluntarily traveled to New York from Dubai, which does not have an extradition treaty with the United States. Second, he provided the prosecutors with extensive, detailed, truthful and helpful information about different people involved in the OneCoin scheme. Third, ███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████ Fourth, while it is clear that Mr. Abdulaziz laundered money at the behest of Ruja Ignatova, and he readily admitted to such, he was not involved in the underlying OneCoin scheme. Fifth, a substantially below Guidelines sentence is consistent with the sentences of other defendants. Sixth, as the many attached letters show, Mr. Abdulaziz is a man of admirable character, who has consistently prioritized his wife, children, family and loved ones. Seventh, due to the █████████████████████████████, it is particularly urgent that he be permitted to return to Dubai as soon as possible. Eighth, because Mr. Abdulaziz is not a citizen of the United States, he is not entitled to certain programs in prison that are available to citizens. Ninth, Mr. Abdulaziz is a 61-year-old man and this is his first brush with the law, making him an

exceeding low risk of recidivism. <u>Tenth</u>, while the principle of general deterrence is often cited as a basis for a more substantial sentence, this Court would be right to send a message that when someone travels to this country to face an indictment, particularly from a country without an extradition treaty with the U.S., the message of general deterrence is significantly tempered by the need to encourage people to do what Mr. Abdulaziz did in this case.

In light of these circumstances, a sentence substantially below the Guidelines is appropriate to accomplish the goals of sentencing after considering Mr. Abdulaziz's character as detailed in the more than 40 letters accompanying this Sentencing Memorandum from his friends and family who plead with this Court to impose a lenient sentence. As the Court will see, the letters accompanying this Memorandum are replete with personal vignettes demonstrating that Mr. Abdulaziz is more than his criminal conduct. Indeed, from these extraordinary letters, the Court will see Mr. Abdulaziz as an uncommonly kind, caring and generous person who has used his time and effort to help others in need throughout his life.

By all accounts, Mr. Abdulaziz has dedicated his life to strengthening and elevating his family, while simultaneously seeking to better those around him through countless acts of service and community outreach. Yet, his criminal conduct in this case has overshadowed all the good he has done in his life. As stated in Mr. Abdulaziz's plea colloquy and his letter to this Court, Mr. Abdulaziz readily admits his guilt and takes full responsibility for his actions. (*See* Ex. 1: Letter of Aamer Abdulaziz.) Moreover, Mr. Abdulaziz appreciates that he has no one to blame but himself for the lasting damage he has caused to his future and his family. Though serious and deserving punishment, Mr. Abdulaziz's conduct does not equate with the 60-month maximum sentence or the 48-month sentence recommended by the Probation Department.

For these and the other reasons stated below, we respectfully request that Mr. Abdulaziz receive a sentence substantially below the Guidelines and the statutory maximum sentence of five-years of incarceration.

## I.    MR. ABDULAZIZ VOLUNTARILY TRAVELED FROM DUBAI TO NEW YORK TO SURRENDER AND COOPERATE WITH THE GOVERNMENT IN THE ABSENCE OF AN EXTRADITION TREATY

On August 5, 2021, Mr. Abdulaziz did something that no other defendant in this case did and that few international defendants ever do: he left a country that had no extradition treaty with the U.S. and he voluntarily came here to face his charges and engage our legal system. Between August 2 and August 5, 2021, Mr. Abdulaziz's U.S.-based lawyers traveled to Dubai. At some point on or about August 4, 2021, his lawyers contacted the assigned AUSA and informed him that Mr. Abdulaziz would be traveling to the U.S. the next day. As arranged, he and his lawyers left his home in Dubai and headed to the airport. A plan was in place for Mr. Abdulaziz to meet with federal agents, who would bring him to the courthouse for an initial appearance. He and his lawyers were scheduled to be on a 2AM flight direct from Dubai to New York. His lawyers passed through a customs check point in Dubai, but Mr. Abdulaziz was not permitted to pass. Rather, he was detained by Dubai police on an Interpol Red Notice from the United States in connection with this case.

After a short while, his lawyers were admitted into a small room where Mr. Abdulaziz was being held by several Dubai police officials, one of whom was speaking to him in Arabic. The undersigned and other lawyers entered the room; the undersigned identified himself as Mr. Abdulaziz's U.S. counsel and asked that the police official stop speaking with him. This was met with a reminder that the rules around speaking with detainees in Dubai were different from

America. I then asked if the official could speak with Mr. Abdulaziz in English, as I did not speak Arabic. He graciously complied.

The official informed us that Mr. Abdulaziz was wanted in the United States. We assured him we knew that, and that we were boarding a flight to JFK to surrender to the United States as part of an arrangement with the U.S. Justice Department. We also assured the Dubai official that the U.S. Government indicated the Red Notice had been lifted, prompting the official to show the undersigned the active Red Notice on his computer. Our bags were removed from the plane, our passports were taken, Mr. Abdulaziz was taken into custody and we were told we could not leave Dubai until further notice. Some of his lawyers left the next day; others remained with Mr. Abdulaziz for about a week, while the matter of the Red Notice was sorted. A week later, on August 12, 2021, Mr. Abdulaziz tried for a second time to surrender to the U.S., this time successfully.

Before reviewing the other aspects of Mr. Abdulaziz's background and character that serve to mitigate his sentence, it made sense to start with this one. No other defendant in this case came to the U.S. of his or her own volition. While the case was rich with cooperators (indeed, this was one reason why the government did not give Mr. Abdulaziz a cooperation agreement), no one made the effort to come to the U.S. voluntarily to face these charges. This fact alone makes Mr. Abdulaziz unique and deserving of appropriate leniency.

What is most remarkable about Mr. Abdulaziz's decision to come to the U.S. is that the law of the U.A.E. allowed him to not come to the U.S. It is not the case that by coming here, he was following what the law of his country of residence or citizenship required. Indeed, the law of the U.A.E. does not require him to come to the U.S. under any circumstances. He would have been within his legal rights as a citizen of Bahrain and a resident of the U.A.E. to remain there for as long as he wished. If he did so, he would conceivably live out his days as a free man. This is a

choice many other defendants in other cases have made, and make anew, every day. As just one example, there are several Swiss citizens living in Switzerland who have been indicted in the U.S., primarily for aiding and abetting U.S. tax evasion, and they are content to live the rest of their lives in freedom in a country that will not extradite them. This is true for many defendants in countries around the world where no extradition treaty exists with the U.S. So, it is not the case that Mr. Abdulaziz did merely what the law required of him.  Rather, he came here as a matter of personal honor.

It bears noting that Mr. Abdulaziz voluntarily came to the U.S. not once but twice. As described further below, in the Spring of 2023,  . The Probation Department, the government and the Court trusted Mr. Abdulaziz enough to permit him to travel back to Dubai to tend to fully confident that he would return when In May 2023, he traveled to Dubai and remained there for about six months to provide By November 2023, return to New York in November 2023. By this point, he knew that many of the other defendants had already pleaded guilty and it was unlikely he would receive § 5K1.1 credit.

Nonetheless, he kept the commitment he made to the Court and the government as well as to himself. Certainly, there are practical reasons for someone to avoid being a fugitive. Being under indictment would impact his businesses and his ability to travel outside of the U.A.E. However, in addition to that, he was motivated by his own sense of morality, his own sense of honor. This combination compelled him to do something that very few defendants do. This is especially compelling when, as is the case here, the goal in traveling to the U.S. was to provide the U.S.

government with complete, full and truthful information about his role and the roles of others in the crime.

## II.    MR. ABDULAZIZ'S COOPERATION REGARDING ONECOIN CONSPIRATORS WAS TIMELY AND SIGNIFICANT

As noted, Mr. Abdulaziz came to the United States to answer for his conduct and to provide material assistance to the government in its pursuit of the OneCoin investigation. When Mr. Abdulaziz voluntarily came to the U.S., leaving his family in Dubai, he knew he would likely be here for several years. It was explained to him that the OneCoin fraud was committed by people from all over the globe and that it would take several years for U.S. officials to build cases, and arrest, prosecute, try and potentially sentence these international targets. It was further explained that as a cooperating defendant, Mr. Abdulaziz may be sentenced last, after other targets resolved their cases. Even knowing this, his resolve was firm: he wanted to come to the U.S. and cooperate no matter how long the process would take and knowing the end-result would be uncertain. Mr. Abdulaziz honored his commitments to the government, pled guilty, provided both substantial and critical information relevant to the OneCoin investigation, and has remained in the United States for nearly four years as a result.

Ultimately, the government advised that it would not be able to use Mr. Abdulaziz as a cooperating witness and would not be providing a § 5K1.1 letter. While the defense does not have perfect clarity on the reasons behind the government's decision, it appears that the government was able to assemble several cooperators who perhaps had closer dealings with the people at the top echelons of the crime than did Mr. Abdulaziz. Also, that the case featured targets who were largely outside the United States, it appears the government made a decision to move forward with the sentencing of Mr. Abdulaziz rather than holding his case open in the event that certain other targets were arrested.

While the government has not filed a departure motion pursuant to § 5K1.1, this Court should nevertheless seriously consider Mr. Abdulaziz's cooperation in finding that a significant variance is warranted based on his efforts to help the government and the threats that he and his family have faced as a result. *See United States v. Olaiya*, 446 F. App'x 388, 389 (2d Cir.2011) *quoting United States v. Fernandez*, 443 F.3d 19, 33 (2d Cir. 2006) ("Under section 3553(a)(1), district courts should consider 'the contention that a defendant made efforts to cooperate, even if those efforts did not yield a government motion for a downward departure pursuant to U.S.S.G § 5K1.1'").

In this case, there can be no question that Mr. Abdulaziz's cooperation was timely, significant and consequential. (PSR at 43 ("The government views Salman's attempted cooperation as a significant mitigating factor in his favor.").) Over the course of multiple proffer sessions, Mr. Abdulaziz provided the government with information about the following people and entities that were intimately involved in orchestrating and facilitating the OneCoin scheme:

1)  Several OneCoin co-conspirators who remained at large;

2)  

3)  

4)

(*See* Ex. 2: Counsel's Letter to the Government, Dated May 22, 2024.) In an effort to further uncover and produce inculpatory information about these people, Mr. Abdulaziz gave the government access to his emails. (*Id*.) ████████████████████████████
████████████████████████████████. (*Id*.)

During the course of multiple proffer sessions, Mr. Abdulaziz provided the government with a great deal of first-hand, actionable information typically corroborated by emails or other documentation that he too agreed to provide. He gave the government the names and contact details for the people with whom he coordinated. He advised of all of his prior communications and transactions with the OneCoin co-conspirators. He detailed, with exceptional clarity, who he knew was involved in the scheme, and their respective roles.

Based on the breadth and weight of the inculpatory information that Mr. Abdulaziz shared with the government during his nearly four years in the United States, we respectfully ask that the Court consider this factor heavily in determining what we believe to be an appropriate, below-Guidelines sentence.

### A.      Mr. Abdulaziz's Efforts to Salvage the Fund's Assets and Pay Off His Debts

When news of the OneCoin investigation broke and media outlets began to connect it to Mr. Abdulaziz's Phoenix Fund, his business suffered immensely and rapidly. Mr. Abdulaziz took proactive steps, as quickly as possible, to salvage his business and the assets associated with it, to little avail. He continued these efforts during the course of his cooperation.

Unfortunately, the value of the thoroughbred assets that Mr. Abdulaziz acquired with OneCoin funds was destroyed by the public revelations surrounding OneCoin. His horses were no longer able to compete, holds were placed on existing bank accounts and some accounts were closed altogether. The fund lost trainers, providers and business partners. Mr. Abdulaziz subsequently lost racing licenses and hemorrhaged funds caring for the thoroughbred assets until he was deeply in debt.

Despite this, Mr. Abdulaziz made every effort possible, financially and otherwise, to salvage the business. He refused to lay off his employees and continued to pay operating expenses

as they came on a monthly basis. On multiple occasions, Mr. Abdulaziz tried unsuccessfully to sell the entire portfolio of thoroughbreds but was unable to do so because they had become tainted and toxic assets. At one point, he was approached by an investor from China who said he planned on paying a large amount of money for the portfolio. Counsel discussed this possible buyer with the prosecutors. However, it became apparent this buyer was not serious about the sale, and the sale did not go through. The preference was always to sell the entire portfolio of horses. This was the cleanest way to get the most money for these assets. However, when that was not possible, many of the horses were sold by the barns who had liens on the horses. Like cars or other pieces of equipment, it is common for barns, trainers or other service providers to take a lien on the horse to ensure that the services provided are paid for. When Mr. Abdulaziz could not pay for these services, the horses were sold to pay the outstanding debt. Whenever a horse was sold – either volitionally by Mr. Abdulaziz or, as was more often the case, as part of a lien sale – his counsel emailed the assigned prosecutors. This process continued throughout his cooperation, with counsel in direct contact with the government, advising them each and every time that a sale successfully did go through. (PSR ¶ 123.)

Despite his best efforts, the business plummeted, and Mr. Abdulaziz's debt skyrocketed. He was ultimately bailed out by a family member who assumed many of Mr. Abdulaziz's significant debts and provided a further $1M for Mr. Abdulaziz's restitution to the United States government. We recognize and accept that the government was expecting more than $1,000,000 as restitution for the fraud victims, and Mr. Abdulaziz wishes there was more. However, horses are notoriously poor investments, and the maintenance fees, barn fees, hay and grain fees, veterinarian fees and other costs ate up the money he once had.

**III.** ████████████████████████████████████████
████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████

████████████████████████████████████████
██████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████

██████████████████████████

████████████████████████████

█████████████████████████████

████████████████████

## IV.    MR. ABDULAZIZ WAS NOT INVOLVED IN THE UNDERLYING ONECOIN SCHEME

It is undisputed that while Mr. Abdulaziz was certainly involved in laundering money derived from the OneCoin fraud scheme, and pleaded guilty to such, he was not directly involved in the scheme to defraud individual investors, as were many other defendants.  As Mr. Abdulaziz informed the government at great length and in detail, he was introduced to Ruja Ignatova at a time when she was encountering difficulty opening a bank account in the U.A.E.  As a resident of the U.A.E., Mr. Abdulaziz agreed to help her with a banking license.  At the time, Mr. Abdulaziz was in the process of developing a business investing in racehorses.  Ultimately, as reflected in the PSR, between February 2017 and April 2017, Ignatova caused about 185 million euros to be sent to the Phoenix account in eleven separate wire transfers. (PSR ¶ 49.)

At some point in March 2017, in the midst of the series of wires to Phoenix, Ms. Ignatova directed Mr. Abdulaziz to send 8.7 million euro to a lawyer in Bulgaria as part of a transaction that Mr. Abdulaziz had reason to believe was illegitimate. This was the Bea Diva transaction. (PSR ¶ 53.) At this point, as he explained to the prosecutors in the proffer meetings, he knew he was laundering Ms. Ignatova's money.  Over the course of the next several months, the red flags increased, but Mr. Abdulaziz continued to assist the OneCoin conspirators with their efforts to keep the business afloat, despite mounting legal difficulties around the world.

There is no dispute that Mr. Abdulaziz was not a OneCoin insider, as were Ruja Ignatova, Sebastian Greenwood, Irina Dilkinska, Mark Scott, Gilbert Armenta and others.  Rather, after

meeting Ms. Ignatova and coming into possession of over a hundred million dollars of money he knew she controlled, he agreed to launder many millions of dollars of that money (to be clear, we do not dispute any of the figures in the PSI Report) and thereafter assisted to keep the OneCoin business alive.  We do not wish to minimize Mr. Abdulaziz's responsibility in this case; it is an extraordinarily serious matter to launder money.  We only seek to point out that a significant amount of criminality in the OneCoin case (including all of the actual misrepresentations to actual victims) had nothing to do with Mr. Abdulaziz.  We believe this is a fact that the Court can consider in fashioning a sentence that is sufficient, but not greater than necessary, to meet the purposes of sentencing.

## V.    THE NEED TO PREVENT UNWARRANTED SENTENCING DISPARITIES SUPPORTS A BELOW-GUIDELINES SENTENCE

This Court should consider Mr. Abdulaziz's relative culpability, the length of his involvement in the scheme, his attempted cooperation, and the sentences of co-defendants in fashioning an appropriate sentence that meets the ends of justice.  Critically, as just mentioned and as acknowledged by the Probation Department, Mr. Abdulaziz "was not involved in the commission of the underlying wire fraud and should not otherwise be held accountable for it in terms of relevant conduct." (PSR at 43.)

The Court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  According to data collected by the U.S. Sentencing Commission, in fiscal year 2023, 42.8% percent of money laundering offenders received a variance.  U.S. Sentencing Commission, *Quick Facts: Money Laundering* (2023) at 2 (stating that 97.3 percent of the 42.8 percent of money laundering offenders who receive a variance receive a downward variance).  And in those cases, the average sentence was reduced 45.9 percent below the Guidelines range.  (*Id.*)

The sentences the Court imposed in related cases for similarly situated defendants counsel a below-Guidelines sentence for Mr. Abdulaziz.  *See United States v. Parker*, 462 F.3d 273, 277-78 (3d Cir. 2006) ("a sentencing court may reasonably consider sentencing disparity of co-defendants in its application of [the § 3553(a) factors").  For example, this Court fashioned a 48-month sentence for Irina Dilkinska, who pleaded guilty to conspiracy to commit wire fraud and conspiracy to commit money laundering, despite a Guidelines range of life imprisonment capped by a statutory maximum of 120 months.  *See* Dilkinska Sent'g Tr. (ECF No. 654) at 5:16-17, 23:5.  The nature, extent and duration of Ms. Dilkinska's conduct were far greater than Mr. Abdulaziz's.  As OneCoin's head of legal from 2015 to 2018, Ms. Dilkinska was an "early member and critical member" of the underlying fraud, which, as this Court is aware, hurt millions of victims, some of whom lost their retirement savings.  *Id.* at 6:24-25, 19:6-11.  Her extensive involvement "caused the scheme to continue to be successful for a lengthy period of time" and provided her with a "vantage point that allowed her to realize, certainly over the course of her tenure there, the scope of the fraud, and … who the victims were."  *Id.* at 20:3-4, 20:10-13.  Still, recognizing that Ms. Dilkinska was subject to deplorable detention conditions for a year prior, without visits from her family, who resided in Bulgaria, the Court found that a downward variance was appropriate.  *See* Dilkinska Sent'g Tr. at 21:25-22:6.

Gilbert Armenta, who was a key figure in the OneCoin scheme from 2015 until his arrest in late 2017, was given a 60-month incarceratory sentence for conspiracy to commit wire fraud, three counts of conspiracy to commit money laundering, and conspiracy to commit Hobbs Act extortion, despite a Guidelines level of 43 and a corresponding Guidelines sentence of 100 years imprisonment. Sent'g Tr., *United States v. Armenta*, 17 Cr. 556 (ER), (S.D.N.Y. Mar. 2, 2023) (ECF No. 76) ("Armenta Sent'g Tr.") at 18:11-19.  As this Court knows, Armenta's fraudulent conduct

was extensive, involving administration of "pool accounts" to aggregate victim funds at various international banks, repeated creation of false documents to launder over $400 million in proceeds over a two-year period, and extortion of a co-conspirator to return $32 million by directing two men to follow and take pictures of the co-conspirator's wife and daughter and threaten him.  Gov't Sent. Memo, *United States v. Armenta*, 17 Cr. 556 (ER), (S.D.N.Y. Feb. 13, 2023) at 4-6.  Though Mr. Armenta provided "extraordinary" cooperation to the government, this was undercut by subsequent criminal conduct, including the "surreptitious sale" of a private jet for $2.2 million and fraudulently opening an account to receive another's $5 million treasury refund check. *Id.* at 8-10 (government describes these as "flagrant violations of his cooperation agreement").  Still, the Court, considering all the § 3553(a) factors, including the unlikelihood of recidivism, prior 8-month confinement at MCC without contact with family members, extensive cooperation, and strong family and community ties, varied downward significantly. *See* Armenta Sent'g Tr. at 63:7-11, 64:9-10, 64:16-21.

Konstantin Ignatov—who worked as a personal assistant for his sister, Ruja Ignatova, the OneCoin founder and leader who became the public face of the company after she fled—was sentenced to time served on wire fraud, conspiracy to commit wire fraud and conspiracy to commit money laundering counts.  Gov't Sent. Memo for Ignatov (ECF No. 629) at 2; Ignatov Sent'g Tr. (ECF No. 651) at 32:11-12.  Mr. Ignatov's involvement in the scheme included making fraudulent representations about OneCoin's structure, value, functionality and future public offering at promotional events in at least nine different countries.  Gov't Sent. Memo for Ignatov at 2, 5. Though Ignatov provided substantial cooperation, the government did not provide a 5K letter due to Ignatov committing perjury at the trial of co-defendant, Mark Scott.  *Id.* at 6.  Though the Guidelines range was 1,080 months, the statutory maximum, the Court found that a substantial

variance was appropriate given the risk Ignatov invited by cooperating and brutal conditions that he faced at MCC for almost three years away from his family in Bulgaria.  Ignatov Sent'g Tr. at 7:3-8, 30:8-19.

Mark Scott, who was convicted at trial and received a 120-month sentence, was far closer to the OneCoin conduct than was Mr. Abdulaziz.  Scott "worked to meticulously conceal from the banks any connection between OneCoin and the purported investors in Fenero Funds."  Opinion and Order, U.S. v. Scott (ECF No. 577) at 3.  In addition, Scott lied to the Apex Group, which was conducting anti-money laundering checks on the business specifically to hide the connection between OneCoin and Fenero Funds.  *Id.*  Given the distinction in roles between Scott and Abdulaziz as well as the fact that Scott was a lawyer and he proceeded to trial and was convicted whereas Abdulaziz voluntarily traveled to the United States from a country without an extradition treaty with the U.S. to cooperate with the authorities, the sentence here should be lower than the five-year statutory maximum sentence.

Generally, Mr. Abdulaziz's sentence should reflect both that his culpability is lower than that of other OneCoin conspirators, and that he provided the government with substantial cooperation in the prosecution of his own offense.  Unlike Ms. Dilkinska, Mr. Armenta, and Mr. Ignatov, who each played a direct role in defrauding victims, Mr. Abdulaziz "was not involved in the commission of the underlying wire fraud and should not otherwise be held accountable for it in terms of relevant conduct."  (PSR ¶ 75; *see also* PSR at 43.) Moreover, unlike the years of fraud by Ms. Dilkinska, Mr. Ignatov and Mr. Armenta, Mr. Abdulaziz's conduct was mostly limited to a period of only a few months.  (PSR at ¶ 49 (noting that "between approximately February 2017 and April 2017" there were "approximately 11 wire transfers totaling €185 million" to Phoenix Fund Investments.) Further, the losses attributable to Mr. Abdulaziz are close to half of those

attributable to Ms. Dilkinska, Mr. Armenta, and Mr. Ignatov. (PSR ¶¶ 72, 73, 75); Armenta Sent'g Tr. at 17:15-16.

Mr. Abdulaziz should also be given credit for his efforts to cooperate with the government in the prosecution of his own offense. As discussed in greater detail above (*see* Sections II, III), after voluntarily traveling to the United States to self-surrender, Mr. Abdulaziz engaged in multiple proffer meetings with the government, during which he provided critical and sensitive information about participants in the OneCoin scheme, including ███████████████████████ ███████████████████████████████ From the moment Mr. Abdulaziz met with prosecutors, he was forthcoming and truthful, providing "credible and useful information" even though he knew he would not be receiving a 5K letter because the non-fugitive OneCoin defendants had already pleaded guilty. (*Id.*)

Like Mr. Armenta and Mr. Ignatov, whose cooperation was considered even without 5K letters, Mr. Abdulaziz should receive credit for his cooperation. (*See id.* at 43-44 (finding that "despite the fact that he will not be receiving the benefit of a reduction under §5K1.1, … the assistance which [Abdulaziz Ahmed] Salman rendered to the government should be credited" and recommending a below-Guidelines sentence).) Moreover, like the co-defendants discussed above, Mr. Abdulaziz is noted to have otherwise been a law-abiding citizen and someone with strong family and community support. (*Id*. at 44.)

Considering these factors, we respectfully submit that a sentence substantially below the Guidelines and the five-year maximum sentence is appropriate and consistent with the sentences of co-defendants in this matter.

## VI.    MR. ABDULAZIZ'S CHARACTER AND REPUTATION WITHIN THE COMMUNITY

In support of this memo, we respectfully submit dozens of letters from Mr. Abdulaziz's friends, family, colleagues, and associates who have known him for years and even decades. Together with the PSR's recitation of Mr. Abdulaziz's history and upbringing, these letters reflect the significant obstacles he has overcome, the strides he has made, and the consistent efforts he has engaged in to make a positive impact on the lives of those around him. As recounted by those who know him best, Mr. Abdulaziz is recognized within his personal and professional communities as a man of honor, integrity, compassion and generosity. (*See, e.g.*, Ex. 3: Letter of Svitlana Rymarchuk at 2 ("His faith is strong and influences his entire life and decisions he makes. This is witnessed in Amer's honesty and integrity, kindness, gratitude, respect and forgiveness for others in both business and personal areas of life."); Ex. 4: Letter of Qamar Nassar at 1 ("Aamer is a man of rare generosity and kindness. . . . His warm personality and strong moral character embody the true meaning of friendship and support."); Ex. 5: Letter of David Lucas at 1 ("I have found him to be of the highest business morals with absolute transparent honesty and reliability."); Ex. 6: Letter of Muhammed Ismail at 1 ("[Mr. Abdulaziz] has consistently demonstrated unwavering integrity, honesty, and moral character. He is a person of high principles and always strives to do what is right, even in challenging situations."); Ex. 7: Letter of Salman Abdulaziz at 1 ("He is compassionate, empathetic, humble with high level of integrity.").)

### B.    A Dedicated Family Man and Caretaker by Nature

Mr. Abdulaziz was born in January 1964 in Bahrain, one of eight children to Abdulaziz Salman (construction company owner) and Maryam Moosa Allai (homemaker). (PSR ¶ 103.) Mr. Abdulaziz was raised in what he described as a "conservative and close-knit" family, whose parents

stressed the importance of "good values," particularly that of "being honest and charitable, and focusing on the importance of education." (PSR ¶ 105.)

Growing up in a large Muslim family, Mr. Abdulaziz learned the importance of caring for and supporting his family. (*See*, *e.g.*, Ex. 7: Letter of Salman Abdulaziz at 1 ("Family wise, he used to show us how to take care of our mother with her special needs and chat with her on daily base. My kids and our mother are so attached to him in full emotional bonds."); Ex. 8: Letter of Nasser Malik at 1 ("His character shows that he is a family man from the start to the finish, and this can immediately be seen with how he treats his daughters, his wife, how he treats his friends, and how he treats me.").) Notably, Mr. Abdulaziz's life has shown that he has taken it upon himself to be the foundation and source of support (both financially and emotionally) for his family, through its most difficult and taxing years.

Mr. Abdulaziz's daughters, Maryam and S██, who describe him as "a hero in [their] eyes," best summarize his dedication to his family and the "impactful role" he plays in their lives:

> Our father is the root of our family. He is an influential figure who shaped the path to where the family stands. Without him, we wouldn't be where we are today. … Our family faced countless challenges, but our father passed through them all like a breeze and fought silently and []relentlessly. His love and perseverance taught us many valuable lessons in life and those are traits we would love to inherit from him. His determination inspires us all today to achieve our own dreams….

(Ex. 9: Letter of Maryam & S██ Abdulaziz Ahmed Salman at 1-2; *see also* Ex. 3: Letter of Svitlana Rymarchuk at 2 ("I know his wife and kids, and can characterize Amer as a great husband and father. He cares a lot about his wife and children, and it was always sweet to witness him at the 'proud father' moments, whenever he would share the achievements of his daughters.").)

Mr. Abdulaziz is a pillar of support for both his wife and daughters, providing constant support "in the good and bad of life." (Ex. 10: Letter of Nada Al Ali at 1.) ███████████ ████████████████████████████████████████████ Mr. Abdulaziz always

championed his daughters' educations and careers inspiring them to "'dream and dream big' and work hard to achieve those dreams." (Ex. 9: Letter of Maryam & S██ Abdulaziz Ahmed Salman at 2.) His daughter, S██, explains that when the family did not have enough money to cover school fees, her father "never lost sight of his hope" for his daughters "to succeed." (*Id.*) From that moment, he "made it his personal mission to homeschool [his daughters] and provide [them] the best education available." (*Id.*) When Maryam first wanted to become an architect and later decided to change her degree to business, Mr. Abdulaziz, "openly encouraged [her] decision and helped [her] overcome the emotional pressure that came with the change," helping her to "find [her] passion in [her] career." (*Id.* at 1.) These actions have made Mr. Abdulaziz "a hero in [his daughters'] eyes." (*Id.* at 2; *see also* Ex. 10: Letter of Nada Al Ali at 1 ("He was patient and determined for the girls to complete their education and to raise them and give them a good upbringing, so that they would benefit themselves and their society.").)



As with his other daughters, Mr. Abdulaziz encouraged Fatema to continue with her schooling ████████████████████████████ Reflecting on her father's support, Fatema notes her father "is the reason why [she] is academically where [she] is today." (Ex. 11: Letter of Fatema Salman at 1.) Notwithstanding the family's financial difficulties at the time, Mr. Abdulaziz "insisted that [she] complete [her] degree, and [] took a loan to support [her] education."

(*Id.*) And when she failed her first year of higher education, her "father encouraged [her] to continue studying law." (*Id.*) Motivated by her father's willingness to give, Fatema decided to volunteer at Red Crescent, a charity organization in the U.A.E. (*Id.*)

Mr. Abdulaziz also maintains close relationships with his other relatives as well. His brother, Salman, describes how Mr. Abdulaziz mentored him to "build [his] personality and grow as a young physician to help [the] community and support them." (Ex. 7: Letter of Salman Abdulaziz Letter at 1; *see also id.* ("My kids and our mother are so attached to him in full emotional bonds.").) Another brother, Zuhair, writes how Mr. Abdulaziz "serv[ed] as a mentor, offering valuable advice," and notes that Mr. Abdulaziz's "advice and guidance, and [] financial support strengthened [his] resolve, helping [him] push forward and continue" his work supporting needy families. (Ex. 13: Letter of Zuhair Abdulaziz Ahmed at 1.) Mr. Abdulaziz is also involved in the lives of his nieces and nephews, whose education he has supported.  (PSR ¶ 104; *see also* Ex. 11: Letter of Fatema Salman at 1.)

Moreover, Mr. Abdulaziz's sister, Rabha, describes how Mr. Abdulaziz helped her launch her medical clinic, explaining that "[w]ithout him, the clinic wouldn't even be open [] today."  (Ex. 14: Letter of Rabha Abdulaziz Ahmed Salman at 1.) He was critical "in identifying and addressing issues and potential pitfalls," motivated by his "overwhelming desire to help people in need."  (*Id.*) He also offered a shoulder to lean on when "naysayers [] believed [her] efforts were in futility," thereby "strengthen[ing] [her] resolve [and] helping [her] to push forward."  (*Id.*)

As noted above, Mr. Abdulaziz has made a concerted effort, despite being away from his family for almost four years, to remain a meaningful part of their lives, contributing and helping in any way that he can, not allowing them to see how the separation affects him. (*See* Ex. 12: Letter of Pamela Cordina at 2 ("He was always ready to do the right thing and in doing so he prepared

his family for the distance with grace and strength, demonstrating his unwavering commitment to their well-being and, at all times, putting their feelings to the forefront.").) Mr. Abdulaziz's friend, Teresa Starr, expressed a similar sentiment based on her observations of Mr. Abdulaziz while in the United States:

> Aamer loves his wife and children dearly and I know that being separated from them, for such a long period of time, has been incredibly painful for both him and his family. That being said, and being the kind of man that he is, Aamer doesn't let his wife or children see the devastating effect that this isolation has had on him and without fail he will put aside his grief in order to bolster his family and help them through the pain of loneliness and grief at his absence.

(Ex. 15: Letter of Teresa Starr at 2; *see also* Ex. 9: Letter of Maryam & S█ Abdulaziz Ahmed Salman at 1 ("Now that we are older, even with him being miles away, our father still has an impactful role in our lives. Even though the distance is not ideal, our father still makes time to call us everyday and check in on us.").)

Despite his prolonged absence, Mr. Abdulaziz considers it his responsibility to remain a constant source of comfort and support for his relatives and continues doing so to this day. As his sister, Majeda, pointed out, Mr. Abdulaziz cares for his elderly mother and "keeps an eye on the family of two" of his sisters. (Ex. 16: Letter of Majeda Salman at 1.) Ever since the husband of one of his sisters passed away, Mr. Abdulaziz has taken care of his three nieces, "funding their education and financially support[ing] them to cover their living expenses." (*Id.*; *see also* PSR ¶ 104.)

## C. Commitment to His Professional Pursuits and His Employees

Apart from being a dedicated family man, Mr. Abdulaziz has fostered equally cherished relationships with those who have crossed his path in a professional setting. As several letters note, Mr. Abdulaziz is unique as an employer insofar as he refuses to treat his employees as subordinates, but rather views them as equals, and treats them each with dignity, respect and grace. (*See, e.g.*,

Ex. 17: Letter of Jaime Watson at 2 (Mr. Abdulaziz "believes his colleagues are an extension of his family"); Ex. 18: Letter of Najwa Bekkous at 1-2 ("Aamer's leadership goes beyond just professional development. He connects with his employees on a personal level, offering guidance, encouragement, and unwavering support."); Ex. 19: Letter of Gerard Butler at 1 (noting Mr. Abdulaziz's "integrity," "loyalty," "straightforwardness," and that "[h]e treats everyone he meets with the utmost respect.").)

Jamie Watson, a former employee of Mr. Abdulaziz, expressed the gratitude he feels for the opportunities Mr. Abdulaziz offered him:

> Aamer has become, in some ways, a bit of a mentor. I've watched how he conducts himself, I have sought advice on a number of topics, and he has given me opportunities to grow and develop well beyond the role I was originally hired to do. His way of working, willingness to share amazing experiences, and encouragement have helped me achieve far more than I thought possible in an industry often closed off to those not born directly into it.

(Ex. 17: Letter of Jamie Watson at 1.)

Teresa Starr, the friend of Mr. Abdulaziz mentioned above, offered her impression of Mr. Abdulaziz as an employer who was gracious towards his staff, accommodating them and meeting their needs whenever possible:

> One thing I have particularly noticed about Aamer, is that he is a loyal and totally supportive employer. Even in circumstances when a position becomes redundant, for whatever reason, Aamer will create another position so that the employee has no need to leave. Aamer knows that his employees depend on him to support their families both in Dubai and their home countries and he takes this responsibility incredibly seriously. Aamer always makes time for his employees' concerns and does what he can to alleviate their problems whether by providing a loan, advice or simply a shoulder to cry on.

(Ex. 15: Letter of Teresa Starr at 1.)

Another employee of Mr. Abdulaziz's, Svitlana Rymarchuk, similarly remarked on his kindness and generosity towards employees:

24

The best example of Amer's best qualities from my experience was Amer's support when I was going through the toughest times myself. First, when my father passed away, Amer took care of my flights to get home, also I was given as much time as I required to grieve and heal. Second, when the war broke out in Ukraine, Amer, knowing that my family was there at the time, offered help to get them to a safer place. I really appreciate the thoughtfulness and desire to help. Living alone in a foreign country is not always easy, however knowing that there is someone you can count on and ask for help in times of desperation really makes a difference, and I am very grateful.

(Ex. 3: Letter of Svitlana Rymarchuk at 1-2; *see also* Ex. 12: Letter of Pamela Cordina at 2 (Mr. Abdulaziz has historically provided assistance to those in need, including "employees whose families have been struck by illness or adversity in which case Aamer always provides both financial and emotional support."); Ex. 20: Letter of Tariq Mahmood at 1 ("During my employment, I have witnessed countless instances where I have seen [Mr. Abdulaziz] helping people morally and financially."); Ex. 21: Letter of Zaheer Bhojani at 1 (Mr. Abdulaziz treated all his staff as "family members" and was always available "to help and support" in both financial and moral ways).)

### D.    Kind Acts and Good Deeds Punctuate Mr. Abdulaziz's Life

The letters submitted on Mr. Abdulaziz's behalf reveal a man who is uncommonly kind, generous, and caring. As nearly every writer recounts, Mr. Abdulaziz is uniformly recognized to be a man of altruism and community service, who is willing to give the shirt off his back to those who need it most. Unlike so many defendants who appear before this Court, Mr. Abdulaziz has made significant and sincere efforts to meaningfully change the lives of his friends, family, and even strangers. (*See e.g.,* Ex. 4: Letter of Qamar Nassar at 1 ("He is always there to lend a helping hand to anyone in need, without waiting to be asked. . . . He is someone you can rely on in the toughest times, always there for those in need, without hesitation or delay."); Ex. 22: Letter of Saeed Abdullah Al Baqqali at 1 ("Aamer is distinguished by his good morals and generosity. He

always tries to spread positivity and contribute to alleviating the suffering of the needy."); Ex. 12: Letter of Pamela Cordina at 2 ("Aamer is dedicated to good causes. . . . [His] commitment to helping others and his strong moral character make him an invaluable member of any community.").)

Within the dozens of letters submitted, Mr. Abdulaziz's friends, family, and community leaders recount the nearly countless ways in which he has provided counsel and emotional support to those who were struggling, engaged in charitable work in favor of local business ventures, and contributed towards causes that he saw as strengthening the community he was a part of. What is most remarkable about Mr. Abdulaziz's good deeds, apart from the fact that they were done when no one was watching and he had no need to impress a federal judge deciding his fate, is how often they are made at his own suggestion, without the receiving party's request.

Mr. Abdulaziz's sister, Majeda Salman, noted the multiple families that Mr. Abdulaziz helps on a regular basis with their basic living needs:

> From family to relatives and neighbors, Aamer provides monthly support to around twenty families that have insufficient income and cannot cover daily life expenses. Three of these families lost their father and have orphans. The rest of the families either their father retired and/or receive low wages that cannot cope with the continuously raised marked prices.

(Ex. 16: Letter of Majeda Salman at 1; *see also* Ex. 23: Letter of Shakir Saeed at 1 (after being diagnosed with multiple sclerosis and losing his job, rendering him unable to care for his family, Mr. Abdulaziz offered "ongoing contributions and assistance" which allowed him to "meet the expenses of [his] treatment and to provide for the needs of [his] wife and children."); Ex. 24: Letter of Naser AlAttar at 2 ("He has a very generous heart and passion for helping the needy. . . .there are several poor families and orphanages who receive monthly financial support from Ammer and

26

this has been going on for years."); Ex. 25: Letter of Huda Al Ali at 1 ("[N]eedy and sick families

ask for aid because they depend on Brother Aamer.").)

In a similar vein, long-time friend, Saeed Abdullah Al Baqqali, notes how Mr. Abdulaziz

"did not hesitate" to help him when Saeed was suffering through financial troubles:

> Several years ago, I faced some financial problems and was unable to pay my rent
> and my children's school fees. I had no other option but to turn to Aamer, so I went
> to him asking for help at that difficult time. Aamer did not hesitate for a moment.
> He immediately took the initiative and took responsibility for paying all the rent as
> well as my children's school fees. This happened to me on two occasions, and
> Aamer stood by me and helped me in both instances.

(Ex. 22: Saeed Abdullah Al Baqqali Letter at 1.) Remembering Mr. Abdulaziz's generosity, Saeed

reached out to Mr. Abdulaziz again when others needed financial assistance. As Saeed notes:

> I personally remember that several years ago, and on more than one occasion, some
> acquaintances came to me asking for help in paying their rent and school fees for
> their children. Unfortunately, I could not provide assistance to them for their needs,
> so I took them to Brother Aamer to ask him to help them. He immediately took the
> initiative and provided assistance without any hesitation.

(*Id.*; *see also* Ex. 26: Letter of Yosra Salhi at 1 (when Yosra was told he had to pay the full amount

of a loan or risk being placed on a travel ban, Mr. Abdulaziz was "the only person that noticed [he]

wasn't fine" and "solved this problem by paying off the full amount immediately."); Ex. 24: Letter

of Naser Al Attar at 1 (when his business failed and he had "around $30K which [he] could not

cover," it was Mr. Abdulaziz who "stepped in and helped [him] cover those rental dues saving

[him] from potential charges"); Ex. 27: Letter of Fawwaz Al Alawi at 1 (when faced with the loss

of his business during the Coronavirus pandemic and "subjected to a serious financial crisis," Mr.

Abdulaziz "did not hesitate to help" and "proceeded to pay [his] children's school expenses as well

as the rent for [his] house for a period of five years."); Ex. 28: Letter of Adnan Hashem at 1 (when

going through "very difficult circumstances," Mr. Abdulaziz made a personal loan to Adnan, which

he later waived in full due to his inability to repay).)

Family friend Mohamed Abdali Mohamed echoed a similar sentiment about Mr. Abdulaziz's willingness to uplift and educate others, highlighting the importance in education that his parents instilled in him:

> As he is aware of the high tuition fees of the medicine college, (USD 34,000/Academic Year) and being financially capable, he volunteered to shoulder all the expenses of my daughter's Nour academic studies in Dubai Medicine College For Girls for the last four years until her graduation this year. Further, currently he is financially supporting the educational process of my son Abdulla who is suffering of Mild Autism. Such support includes special schooling arrangements for speech therapy and a shadow teacher cost.

(Ex. 29: Letter of Mohamed Abdali Mohamed at 1.)

Among his many acts of public service, Mr. Abdulaziz has consistently offered financial support for those who cannot afford necessary medical treatments. When Teresa Starr, a friend of Mr. Abdulaziz, learned that her insurance would not cover the cost of her husband's heart attack, Mr. Abdulaziz "immediately contributed to the medical costs."  (Ex. 15: Letter of Teresa Starr at 1; *see also* Ex. 22: Letter of Saeed Abdullah Al Baqqali at 1 ("[Mr. Abdulaziz] also covered the costs of treatment for many patients who could not afford the costs of their treatment."); Ex. 30: Letter of Ali Al Raeesi at 1 ("[T]here are many, many people, some of whom I know personally, for whom Aamer undertook to pay for their treatment expenses . . . .").) Teresa also describes how Mr. Abdulaziz, "treats everyone he meets with the same level of interest and attention … [w]hether they be highly educated or illiterate, rich or poor."  (Ex. 15: Letter of Teresa Starr at 2.)

Numerous letters also describe Mr. Abdulaziz's engagement with charity work. Fawwaz Al Alawi reflected on Mr. Abdulaziz's charitable contributions, not only to Fawwaz personally in times of crisis, but to other families and even neighboring countries:

> His kindness was not limited to me only, as when I spoke to him about others who needed financial assistance or work, he always took the initiative to support them. He helped many people, whether in paying the costs of treatment, providing housing, or meeting their basic needs. He also built water wells in poor countries

such as Egypt, Pakistan, Afghanistan, and India, providing water to those who are most in need of it.

(Ex. 27: Letter of Fawwaz Al Alawi at 1; *see also* Ex. 31: Letter of Riyad Moosa Jafar at 1 ("[a]fter graduating from school, he became involved in social activities by helping needy families and orphans"); Ex. 32: Letter of Ali Youssef Hassan at 1 (noting Mr. Abdulaziz's "participation in supporting the Assistance to Orphans, Children and Poor Families Program"); Ex. 33: Letter of Shaikh Yassin Hussain Usman at 1 (describing Mr. Abdulaziz as charitable, "generous and helpful"); Ex. 20: Letter of Tariq Mahmood at 1 (Mr. Abdulaziz's "generosity is not only limited to his employees, but also public members take benefits as well in the form of charity and donations.").) He also "laid out plans to build specialist affordable housing for people struggling with neurodivergent issues such as autism." (Ex. 17: Letter of Jamie Watson at 2.)

Perhaps equally as noteworthy are Mr. Abdulaziz's efforts to assimilate and give back to the local community in New York City over the nearly four years that he has been stranded in what is, to him, a foreign and unfamiliar land. For example, Mr. Abdulaziz has been actively involved with the distribution of food to the needy through New York Cares, a nonprofit organization focused on volunteer management in New York City. (*See* Ex. 12: Letter of Pamela Cordina at 1; Ex. 34: Letter of Patricia Greenbaum at 1.) He has also personally taken it upon himself to bring together the community from within his own building, organizing social events and mixers. (*See, e.g.*, Ex. 35: Letter of Melissa Greenbaum at 1 ("My mother and I have also attended several of his building lobby parties, where he buys pizzas to share with anyone in the lobby who wants a slice on Friday nights. Through these gatherings, all the tenants have gotten to know one another on a more personal level.").)

### E.    Helping People Get Back on Their Feet

In addition to all of the generous donations and acts of kindness that Mr. Abdulaziz has displayed as discussed above, Mr. Abdulaziz has been instrumental in several of his friends' ability to establish new lives and get back on their feet, particularly after facing some adversity.

Mahdi Al Farreekh, a friend of Mr. Abdulaziz, explained how Mr. Abdulaziz personally looked after him when he first arrived in the U.A.E. and was looking for work and housing:

> Respected sir, when I describe the ethics, behavior and good treatment of brother Aamer, it is not surprising or exaggerated because I lived with him for many years, and I was new to him in the relationship when I was looking for work in the United Arab Emirates. In my first 10 days there, he asked me to take my things and luggage from the hotel and he put me up in an apartment with four other people whom I did not know. He told me to stay here temporarily and leave the matter of searching for work to him. I stayed in that apartment for about 23 days. He was the one who called me and asked for my papers for work, and he often invited me to lunch and dinner.

(Ex. 36: Letter of Mahdi Al Farreekh at 2.)  Mahdi later learned that it was Mr. Abdulaziz himself who was "the one paying the rent for the apartment." (*Id.*)

Ekaterine Gabashvili described how Mr. Abdulaziz helped her after she fled her country, Georgia, due to its "political and economic situation" and relocated to Dubai:

> Amer helped me from the beginning, despite not knowing me well for that time. I was struggling to cover even the basics, living in a shared apartment with 10 girls. As a charity, he arranged a full-year rental so that I could shift and at least have an accommodation, the most needed for me for that time to maintain normal work and personal life.

(Ex. 37: Letter of Ekaterine Gabashvili at 1.) Mr. Abdulaziz went on to help Ms. Gabashvili find "a better job" so that she could have what she described as "basic income" to not worry about sustaining her living expenses on commissions. (*Id.*)

Mamata James's letter provides a glimpse into the kind of solace that Mr. Abdulaziz offered to people facing dire straits. After her husband left her life in ruins, financially and otherwise, due

to his gambling and alcohol addiction, Ms. James was forced to pack up her life and relocate to the UK. (Ex. 38: Letter of Mamata James at 1-2.)  Mr. Abdulaziz, who knew Ms. James through the horseracing industry, got in contact with her, offered her a job, and "paid for everything, the expenses of move, house rent etc." (*Id.* at 2.) Ms. James explained that, during this exceptionally difficult time, Mr. Abdulaziz "made sure that we were supported and looked after by all means possible."  (*Id.*) Ms. James explained how, through his pure kindness, Mr. Abdulaziz changed her life:

> Since than life has been far better, Mr Aamer Abdulaziz and the company has played a major role in my and kids life, our mental health and overall wellbeing, they have literally saved our lives. If it wasn't for Mr Aamer Abdulaziz me and my kids would have been homeless. And he did this out of pure goodwill and expecting nothing in return. I am still working for the company, and thriving, so I shall be forever grateful to Mr Aamer Abdulaziz.

(*Id.* at 3.)

### F.    Mr. Abdulaziz Treats People Equally, Regardless of Race, Gender, or Socioeconomic Status

A common theme from the letters of support is that Mr. Abdulaziz treats all people equally, regardless of nationality, race, gender, or socioeconomic status. ███████████████████ █████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ Nonetheless, Mr. Abdulaziz's friends describe him as someone who is eager to help all those around him.  (Ex. 39: Letter of Vishal Pandurang Kodikal at 1 (Mr. Abdulaziz makes charitable contributions "irrespective of

---

█████████████████████████████████████████████████████  ██████████ █████████████████████████████████████████████████████  ████████ ██████████████████████████████████████████████████████████████ █████████████████████████████

nationality, religion, race or gender"); Ex. 27: Letter of Fawwaz Al Alawi at 1 ("I also remember a situation in Lebanon where he contributed to the restoration of a church for a group of needy Christians, which indicates that Aamer's heart is open to everyone regardless of their religion or race."); Ex. 30: Letter of Ali Al Raessi at 1 ("[Mr. Abdulaziz] is known for his good personality, courage, and humanity, as well as for helping others without any discrimination, whether by race or gender."); Ex. 28: Letter of Adnan Hashem at 1 ("[Mr. Abdulaziz] is extremely generous with all those who need assistance in various countries, whether by contributing to the costs of treatment or the restoration of hospitals, mosques and churches. I also would like to mention that he helps people regardless of their race or religion."); Ex. 40: Letter of Sharief Ahmed Abualrahi at 1 ("He has participated in charity. Being a resident in Dubai, he has known many different nations and cultures that he has shown good respect, friendship and love without differentiating between anyone."); Ex. 24: Letter of Naser Al Attar at 2 ("Aamer helps people from all walks of life, he rejects racism and treats and helps people regardless of their race or ethnicity."); Ex. 41: Letter of Rabab Ali Habeeb at 1 (for years, Mr. Abdulaziz "has been continuously active in social work in cooperation with women's associations and contributes to supporting orphans and the childhood program.").)

Najwa Bekkous, one of Mr. Abdulaziz's employees, explained how he gave her a chance when she found herself in "a really tough spot":

> I was jobless, battling depression, and felt completely lost. Despite my situation, Aamer saw something in me that I couldn't see in myself. He hired me when no one else would give me a chance, and that opportunity changed my life. Working under Aamer's guidance, I went from being a shy, depressed, and clueless girl to the confident woman I am today. He constantly pushed me to strive for more, to be better. He encouraged me to continue my education, and with his support, I earned my master's degree in law. His belief in me gave me the motivation I needed to succeed.

(Ex. 18: Letter of Najwa Bekkous at 1.)

Mahdi Farreekh, who Mr. Abdulaziz helped and provided lodging for upon his arrival in the U.A.E., noted how Mr. Abdulaziz helped people from diverse backgrounds who were similarly situated:

> He would not tell me about the other people and that they were also looking for a job opportunity, and that since the cost of living in the UAE was expensive, he and another person helped whoever asked for help. It must be kept in mind that one of the people was not from my country, Bahrain, and was not even Arab or Muslim, but was from India and was a Christian. It was at this juncture that I closely perceived the humanity of this man in his dealings with others, as he was not restricted by gender, race, color, language, religion or sect, since he interacted with people, all people, as human beings.

(Ex. 36: Letter of Mahdi Farreekh at 2.)

## VII.    THE COLLATERAL CONSEQUENCES MR. ABDULAZIZ'S FAMILY FACES DUE TO HIS ABSENCE WEIGH IN FAVOR OF A BELOW-GUIDELINES SENTENCE

The Court should consider the collateral consequences Mr. Abdulaziz's family faces due to his prolonged absence from the U.A.E. First, ███████████████████████████████

████████████████, Mr. Abdulaziz's absence creates a substantial hardship for his three unmarried daughters. Second, Mr. Abdulaziz's absence prevents him from ████████████████

██████████████████████████████████████, as well as from caring for his elderly mother.

### A.    In the U.A.E., a father's presence is critical in the lives of his wife and unmarried daughters

Mr. Abdulaziz's prolonged absence from home has negatively impacted his unmarried, Muslim daughters, █████████████████████████████████████████████████████

███████████████ U.A.E. law "provides that the father is the default guardian of any child with the authority to decide their child's supervision, education, and direction in life." *Trapped: How Male Guardianship Policies Restrict Women's Travel and Mobility in the Middle East and North*

*Africa*, Human Rights Watch (Jul. 18, 2023), https://www.hrw.org/report/2023/07/18/trapped/how-male-guardianship-policies-restrict-womens-travel-and-mobility-middle. As Mr. Abdulaziz's wife explains:

> [I]n our Eastern society, the presence of the father is very important because social matters and relationships are related to the presence of the father. For example, when someone proposes to marry one of our daughters, the father of the girl must receive them, and the marriage contract cannot be concluded except in his presence and with his blessing.

(Ex. 10: Letter of Nada Al Ali at 2.) Because of these restrictions, Mr. Abdulaziz's daughter, Maryam, cannot marry her partner. (*Id.* ("We are currently waiting for Aamer to return so that [Maryam's partner] can come to propose to her with his parents, and the engagement cannot take place except in the presence of her father because these are the customs in our Gulf society."); Ex. 8: Letter of Nasser Malik at 1 ("If God wills, I plan one day to get engaged to one of Aamer's daughter[s] and hopefully get married to her[;] however, due to Aamer's case, I will have to postpone as culturally in the Middle East, the father should be there when the daughter's hand is being asked for marriage.").)

█████████████████████████, "a student is required to register with his or her father's identity card only." (Ex. 10: Letter of Nada Al Ali at 1; *see also* Ex. 9: Letter of Maryam & S███ Amer Abdulaziz Ahmed Salman at 2 ("in the UAE it's the father who is the head of the house[;] my father had to enroll me in school").) Mr. Abdulaziz's daughter's "registration in school was rejected because her father's identity card had expired, and the school warned [her] to stop attending school." (Ex. 10: Letter of Nada Al Ali at 1.) Unfortunately, S███ had to abandon her studies until Mr. Abdulaziz returned home. On the one trip he has taken home in the last 4 years, Mr. Abdulaziz "renewed his ID … so that S███ could return to her school." (*Id.* at 2.)

The Court, in fashioning an appropriate sentence, should consider the undue hardships that Mr. Abdulaziz's extended absence places on his daughters, whose education and family plans depend on his involvement.

**B.    Mr. Abdulaziz is devoted to caring for ███████████ and elderly mother**

Additionally, Mr. Abdulaziz plays an important role in caring for ████████



██ Mr. Abdulaziz also financially supports his fragile mother, who has lived alone since her husband passed fifteen years ago.  (*See* PSR ¶ 103.)  We respectfully submit that Mr. Abdulaziz's role as a caretaker of both ██████ and his mother weigh in favor of a below-Guidelines sentence. *See United States v. Lanzana*, No. 21-2889, 2022 WL 17101229, at *2 (3d Cir. Nov. 22, 2022) (affirming downward variance due to defendant's role as primary caretaker of his ill fiancée).

**VIII.    THE DISPARATE TREATMENT THAT MR. ABDULAZIZ FACES AS A NON-CITIZEN WEIGHS IN FAVOR OF A BELOW-GUIDELINES SENTENCE**

Courts must also consider the collateral effects of a sentence to "properly calibrate a 'just punishment'."  *United States v. Nesbeth*, 188 F. Supp. 3d 179, 193 (E.D.N.Y. 2016) (quoting *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009)).  When determining what sentence is appropriate for a defendant, "a sentencing judge cannot ignore the additional penalties and

hardships that will attach as a result of conviction." *United States v. Chong*, No. 13 Cr. 570, 2014 WL 4773978, at *6 (E.D.N.Y. Sept. 24, 2014).

Indeed, Mr. Abdulaziz's immigration status and its related consequences should be considered as a "mitigating factor" when crafting an appropriate sentence pursuant to 18 U.S.C. § 3553(a). *See, e.g.*, *Brown v. United States*, No. 10 Civ. 3012, 2010 WL 5313546, at * 1 (E.D.N.Y. Dec. 17, 2010); see also *United States v. Sanchez*, 433 F. App'x 44, 46 (2d Cir. 2011). In considering what sentence is "sufficient, but not greater than necessary," the Court may properly review and "take into account the uncertainties presented by the prospect of removal proceedings and the impact deportation will have on the defendant and his family." *United States v. Thavaraja*, 740 F.3d 253, 262-263 (2d Cir. 2014).

Mr. Abdulaziz will be treated differently from many other white-collar defendants because he is not a United States citizen. Mr. Abdulaziz is classified as an "alien." That designation carries significant consequences. As a non-citizen, Mr. Abdulaziz would face harsher conditions than similarly situated defendants because as an alien, he is not eligible to serve a term of incarceration in a federal camp like other non-violent offenders.  Mr. Abdulaziz would additionally spend more days in jail than a similarly situated citizen defendant because non-citizens are ineligible to serve any portion of their terms in a halfway house.  Following any sentence, Mr. Abdulaziz faces an additional period of ICE detention prior to his removal.  And, unlike other white-collar offenders, Mr. Abdulaziz must spend any term of incarceration or house arrest away from family.  We respectfully submit that this disparate treatment warrants a below-Guidelines sentence.

>   **A.   Mr. Abdulaziz would face disproportionately harsh conditions because he is not eligible to serve a prison term in a minimum-security facility like similarly situated offenders who are U.S. citizens**

As a non-citizen, Mr. Abdulaziz is classified as a "deportable alien" by the Federal Bureau

of Prisons ("BOP").  U.S. Dep't of Justice, Fed. Bureau of Prisons Program Statement, *Inmate Security Designation and Custody Classification*, P5100.08 (Sept. 4, 2019) at ch. 5, pp. 9, 12, https://www.bop.gov/policy/progstat/5100_008cn.pdf.  First-time, non-violent offenders are ordinarily considered a minimum-security inmate eligible for placement in a federal prison camp. *Id.* at ch. 1, p.2; ch. 5, p12.  However, prisoners with a "deportable alien" designation must instead be detained in *at least* a low-security facility.  *Id.* at ch. 5, pp. 9, 12 (emphasis added).  While minimum-security facilities exclusively house non-violent offenders with sentences under 10 years, low-security facilities house prisoners who have committed violent offenses garnering prison terms of up to 20 years and who have exhibited violent or threatening behavior.  *Id.*

There is a substantial risk that instead, Mr. Abdulaziz will be placed in a for-profit Criminal Alien Requirement ("CAR") prison, which President Trump favored over BOP facilities for detaining immigrants convicted of federal crimes during his first term.  Jonathan Blitzer, *A New Study Uncovers Troubling Information About Immigrant-Only Prisons*, The New Yorker (Mar. 13, 2019), https://www.newyorker.com/news/daily-comment/a-new-study-uncovers-troubling-information-about-immigrant-only-prisons (last viewed April 2, 2025); *Shadow Prisons*, Detention Watch Network, https://www.detentionwatchnetwork.org/issues/shadow-prisons (last viewed April 2, 2025).  Immediately upon retaking office, President Trump reversed an executive order issued by former President Biden directing the Department of Justice not to renew contracts with for-profit prisons.  Lauren Brooke Eisen, *Trump Reverses Biden Order that Eliminated DOJ Contracts with Private Prisons*, Brennan Center for Justice (Jan. 20, 2025), https://www.brennancenter.org/our-work/analysis-opinion/trump-reverses-biden-order-eliminated-doj-contracts-private-prisons.

President Trump's return to these policies puts Mr. Abdulaziz at greater risk of being

housed in a CAR prison and subjected to detention conditions that are far more severe than those at BOP minimum-security facilities. For-profit, contract prisons "had more safety- and security-related incidents per capita than the comparable BOP institutions." *Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons*, U.S. Dep't of Justice, Office of the Inspector General (Aug. 2016) at 14, https://oig.justice.gov/reports/2016/e1606.pdf ("DOJ OIG Report"). There are "nearly twice as many weapons confiscated as BOP prisons," "a 28 percent higher average of inmate-on-inmate assaults," and "17 percent more use-of-force incidents" by staff against inmates at these facilities. *Id*. at 17-18, 20. Solitary confinement in contract prisons is used to "punish prisoners for minor infractions," "for overflow when the general population dorms are full," and "to threaten[]" prisoners who "complain[] about conditions, [or] help[] others to file grievances." *Warehoused and Forgotten: Immigrants Trapped in Our Shadow Private Prison System*, ACLU (June 2014) at 28, https://www.aclu.org/sites/default/files/assets/060614-aclu-car-reportonline.pdf ("ACLU Private Prison Report"). And CAR facilities are often "filled beyond their rated capacities," restricting prisoners from moving freely due to the tightly-packed dormitories, some of which are just hallways and recreation rooms that have been repurposed to accommodate more inmates. *Id*. at 37.

**B.    Mr. Abdulaziz is not entitled to many of the ameliorative sentencing provisions available to U.S. citizens**

Because of his non-citizen status, Mr. Abdulaziz is not eligible to spend any portion of a prison term in a halfway house. Federal law requires that the BOP, "to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months), under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community." 18 U.S.C. § 3624(c)(1). This policy, however, does not apply to "deportable aliens," who will not be returning

to their communities at the end of their terms. U.S. Dep't of Justice, Fed. Bureau of Prisons Program Statement, *Change Notice*, 7310.04 (Dec. 16, 1998) at 10, https://www.bop.gov/policy/progstat/7310_004.pdf.  As a result, Mr. Abdulaziz would serve more days of any term of incarceration inside a prison than similarly situated citizen defendants.

### C.    Mr. Abdulaziz is subject to mandatory ICE detention following his sentence

Mr. Abdulaziz will be detained by ICE following any sentence of incarceration or house arrest or immediately taken into custody if this Court imposes a probationary sentence or supervised release.  *See* 8 U.S.C. § 1226(a)(1).  Any alien convicted of money laundering in the amount of funds exceeding $10,000 like Mr. Abdulaziz is subject to mandatory detention.  *See* 8 U.S.C. § 1226(c)(1)(B)–(C) (the Attorney General will detain aliens who have committed offenses covered in § 1227(a)(2)(A)(i)–(iii)); 8 U.S.C. § 1227(a)(2)(A)(iii) (aggravated felonies); 8 U.S.C. § 1101(a)(43)(D) (laundering more than $10,000 is an aggravated felony).  Because Mr. Abdulaziz has pleaded guilty to money laundering, he faces additional detainment in ICE custody following his sentence while removal proceedings are commenced against him.  As an ICE detainee, Mr. Abdulaziz would face deplorable conditions.  One investigation of four ICE detention facilities uncovered "egregious violations of detention standards" posing "significant health and safety risks." *Concerns about ICE Detainee Treatment and Care at Four Detention Facilities*, U.S. Dep't of Homeland Security, Office of the Inspector General (June 2019) at 3, https://www.oig.dhs.gov/sites/default/files/assets/2019-06/OIG-19-47-Jun19.pdf.  As of July 2023, 90.8 percent of ICE detainees were held in private, for-profit prisons.  Eunice Hyunhye, *Unchecked Growth:  Private Prison Corporations and Immigrant Detention, Three Years Into the Biden Administration*, ACLU (Aug. 7, 2023),  https://www.aclu.org/news/immigrants-

rights/unchecked-growth-private-prison-corporations-and-immigration-detention-three-years-into-the-biden-administration.

> **D.    Mr. Abdulaziz has been isolated from his family over the past 4 years while this case has been pending and would continue to be isolated if sentenced to a term of imprisonment**

Unlike similarly-situated defendants who are U.S. citizens, Mr. Abdulaziz has been isolated from his family for the approximately four years while his case has been pending, with the exception of his being permitted to return to Dubai ███████████████████████████ ████████████████████ Ordinarily, white-collar defendants who are out on bail continue to live with their families. But Mr. Abdulaziz, a Bahrain native who resided with his family in the U.A.E. prior to his arrest, has not been able to enjoy those same comforts. In the years since his August 12, 2021 voluntary self-surrender (PSR ¶ 68), Mr. Abdulaziz has only seen his family during that one period. (May 2, 2023 Bail Modification Order.) This prolonged separation from his loved ones has been "extremely difficult and stressful" and has caused him to develop "adjustment disorder with mixed anxiety and depressed mood." (PSR ¶¶ 111, 115.)

Mr. Abdulaziz would also spend any period of incarceration away from family. With over 6,800 miles separating him from family, Mr. Abdulaziz would not be able to have regular family visits. The 9-hour time difference would also make it unusually difficult for Mr. Abdulaziz to regularly connect with his family by phone. This disparity in the conditions of confinement and its likely effect on Mr. Abdulaziz's mental health weigh in favor of a below-Guidelines sentence. *Cf. United States v. Chong*, No. 13 Cr. 570, 2014 WL 4773978, at *8 (E.D.N.Y. Sept. 24, 2014) (cutting off a defendant from "established community ties" lessened the need for both specific and general deterrence where defendant would be deported).

## IX.    MR. ABDULAZIZ'S AGE AND HEALTH WEIGH IN FAVOR OF A BELOW-GUIDELINES SENTENCE

"When determining an appropriate sentence, the district court is permitted to consider the defendant's "age, education, mental or emotional condition, [and] medical condition." *Rita v. United States*, 551 U.S. 338, 364 (Stevens, J. concurring). Mr. Abdulaziz is 61 years old and suffers from a number of serious physical medical conditions, including █████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████

If given a lengthy prison sentence, it is likely that Mr. Abdulaziz will not receive the regular checkups and counseling sessions ███████████████████. One evaluation of the BOP found that "limited availability of Correctional Officers restricts aging inmates' access to medical care at outside instructions," resulting in "waitlists to send inmates to outside medical specialists." *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, U.S. Department of Justice, Office of the Inspector General (February 2016) ("OIG Aging Report") at 18, https://oig.justice.gov/reports/2015/e1505.pdf.

Mr. Abdulaziz's conditions would surely worsen as he ages in prison due to the stressful prison environment and lack of access to regular medical care. Studies show that "[i]ncarcerated adults experience accelerated aging, the process in which exposure to incarceration speeds up biological aging." Farah Acher Kaiksow et al., *Caring for the Rapidly Aging Incarcerated Population: The Role of Policy*, J. GERONTOL NURS. (March 2023) at 1, https://pmc.ncbi.nlm.nih.gov/articles/PMC_10129364/pdf/nihms-1894051.pdf; see also *United States v. Jenkins*, 854 F.3d 181, 186 n.2 (2d Cir. 2017) ("[A]s a statistical matter, the life expectancy

of an incarcerated person drops significantly for each year of incarceration.") (citing Evelyn J. Patterson, *The Dose-Response of Time Served in Prison on Mortality: New York State, 1989-2003*, 103 AM. J. OF PUB. HEALTH 523, 526 (2013), https://pmc.ncbi.nlm.nih.gov/articles/PMC3673515/pdf/AJPH.2012.301148.pdf); OIG Aging Report at 1-2 ("an inmate's physiological age averages 10-15 years older than his or her chronological age," in part due to the "stress associated with incarceration"). Additionally, prisoners who do not receive family visits experience more depressive symptoms than those who do. Karen De Claire and Louise Dixon, *The Effects of Prison Visits from Family Members on Prisoners' Well-Being, Prison Rule Breaking, and Recidivism: A Review of Research Since 1991*, TRAUMA VIOLENCE & ABUSE (Aug. 2015) at 4.

If Mr. Abdulaziz is placed in a CAR facility, the health consequences become dire. Because for-profit CAR prisons are contractually obligated to cover the costs of medical care for inmates at their facilities, they are incentivized to understaff medical positions and withhold treatment. ACLU Private Prison Report at 42. One investigation revealed that a CAR facility hired only a single doctor to oversee health services for over 2,000 prisoners. *Id.* Additionally, prisoners with chronic conditions that require regular medication are not able to get regular access to their prescriptions, with some "taking weeks to fill" if they are even "filled at all." *Id.* at 43. In these facilities, "[o]btaining a referral for specialty off-site care was reportedly slow, difficult, and rare." *Id.*

Incarceration in a for-profit prison would jeopardize Mr. Abdulaziz's mental health as well. Inmates at these facilities report an "overwhelming sense of despair" due to lack of family contact. *Id.* at 46. CAR inmates are subject to far higher rates for phone calls than their BOP counterparts, and, unlike BOP inmates, many are not allowed to use email at all. *Id.* at 48. The remote location

of CAR prisons also makes it extraordinarily difficult for families to visit from abroad, and often the facilities do not have enough staff to supervise visitation when families do travel for visitation. *Id.* Such prolonged isolation from family, after already spending nearly 4 years away from them in the United States, ████████████████████████

The court should consider these likely health challenges when imposing a sentence. *See United States v. Hernandez*, No. 03 Cr. 1257 (RWS), 2005 WL 1242344, at *6 (S.D.N.Y. May 24, 2005) (finding defendant's high blood pressure and high cholesterol "significant" and holding that a non-Guidelines sentence was warranted in light of his "need for ongoing medical treatment" and low likelihood of recidivism); *United States v. Lewis*, 23 Cr. 370 (JGLC) (S.D.N.Y. Apr. 4, 2024) (incarceration would be "greater than necessary to comply with the factors under 3553(a)" due in part to the defendant's "physical health concerns and lack of criminal history"); *Rose v. United States*, 20 Cr. 517-3 (VB), 2024 WL 2093627, at *3 (S.D.N.Y. May 9, 2024) (sentencing court varied downward after considering defendant's mental health conditions and other factors).

## X. THE NEED FOR SPECIFIC AND GENERAL DETERRENCE DOES NOT WARRANT ADDITIONAL INCARCERATION

The Court must consider both specific and general deterrence to determine a sentence that is sufficient but not greater than necessary to "afford adequate deterrence to criminal conduct" and "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(B) and (C). We respectfully submit that a sentence substantially below the Guidelines accomplishes these objectives.

### A. Specific Deterrence

Several factors demonstrate that there is little to no risk that Mr. Abdulaziz will recidivate. First, Mr. Abdulaziz accepted responsibility for his offenses. (PSR ¶ 94.) Though Mr. Abdulaziz has no connection to the United States, he voluntarily traveled to the Southern District of New

York to self-surrender and immediately cooperated with law enforcement in the prosecution of his own actions. After being allowed by this Court in May 2023 to return temporarily to Dubai to ███████████████████████████████████, Mr. Abdulaziz returned from Dubai to the Southern District of New York *a second time*, in November 2023, even though by then he knew other defendants had already pleaded guilty and it was unlikely he would receive § 5K1.1 credit. (PSR at 43; *see supra* Section I.)  Such actions demonstrate that he is remorseful for his misconduct and recognizes the harm resulting from the offenses. *See United States v. Ortega*, No. 09 Cr. 742-01, 2010 WL 2541364, at *2 (E.D.N.Y. June 17, 2010) ("specific deterrence [wa]s not a major concern" because it was "unlikely" that the defendant would "engage in further criminal activity considering his supportive family, his sincere remorse, and overall good character").

Second, Mr. Abdulaziz's age makes him unlikely to recidivate.  Mr. Abdulaziz is a 61-year-old first-time offender with a criminal history score of 0 and Criminal History Category of I.  (PSR at 2, ¶ 100.)  According to statistics collected by the United States Sentencing Commission, recidivism rates for individuals with a Criminal History Category 1 who are over the age of 60 at the time of release is just 11.3 percent.  U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* at 25 fig. 22 (Dec. 2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf.  Accordingly, courts have fashioned below-Guidelines sentences on defendants on account of older age.  *United States v. Hernandez*, No. 03 Cr. 1257 (RWS), 2005 WL 1242344, at *5 (S.D.N.Y. May 24, 2005) (noting that "[t]his court and others have previously declined to impose Guidelines sentences on defendants who, like Hernandez, were over the age of forty on the grounds that such defendants exhibit markedly lower rates of recidivism in comparison to younger defendants" and imposing a below-Guidelines

sentence); *United States v. Hodges*, No. 07 Cr. 706 (CPS), 2009 WL 366231, at *8 (E.D.N.Y. Feb. 12, 2009) (noting the "inverse relationship between age and recidivism" and "tak[ing] into account the defendant's age in fashioning his sentence"); *United States v. Carmona-Rodriguez*, No. 04 Cr. 667 (RWS), 2005 WL 840464, at *4 (S.D.N.Y. Apr. 11, 2005) (citing the defendant's age and low probability of recidivism as grounds for imposing a below-Guidelines sentence).

Further, as the Probation Department notes in recommending a below-Guidelines sentence, Mr. Abdulaziz is a man who has "been a law-abiding member of society." PSR at 44. His law-abiding, flawless time spent on pre-trial supervision, coupled with his "educational and vocational skills" and "strong family ties in Dubai" will undoubtedly "serve to aid in his future endeavors" and further suggest that he is unlikely to recidivate. *Id*.

## B. General Deterrence

Although we recognize the importance of general deterrence in the context of white-collar criminal cases, "[c]ommon sense suggests that most business executives fear even a modest term to a degree that more hardened types may not." *United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014). Research shows that more frequent enforcement and prosecution of financial crimes, rather than longer sentences, are the most effective deterrents to would-be white-collar criminals. See Peter J. Henning, *Is Deterrence Relevant in Sentencing White-Collar Criminals?*, 61 Wayne L. Rev. 27, 48-49 (2015); Richard S. Frase, *Punishment Purposes*, 58 Stan. L. Rev. 67, 80 (2005) ("White-collar and regulatory offenders are more likely to be deterred, even by selective enforcement and modest penalties; such offenders have many lawful alternatives and much to lose from being convicted, regardless of the penalty."). A downward variance would also signal to criminal defendants around the world, particularly those who like Mr. Abdulaziz are in countries lacking extradition treaties with the

United States, that voluntary self-surrender can lead to better outcomes than being a fugitive for life.

### C.    Encouraging Defendants Abroad to Face Their U.S. Charges

The concept of general deterrence is unique among the Guidelines' considerations because it is focused on encouraging people similarly situated to the defendant to act lawfully in the future. An appropriately lenient sentence in this case would certainly send the message to all potential defendants based abroad that the Court will look favorably upon them coming to the United States to address their charges. This is an especially compelling message to those defendants who may be in nations with no extradition treaty with the United States. It is even more compelling when the Court considers that here, Mr. Abdulaziz came to the U.S. specifically to cooperate and knowing that he would be away from his wife and three daughters for many years. While we understand that the Court may have concerns with fashioning a substantially below-Guidelines sentence in a highly public international money laundering case, the Court has already shown great circumspection and temperance in the sentences it has imposed. In that same spirit, the Court has strong reasons to grant an appropriately lenient sentence here, given the unique circumstances facing this defendant and given the tremendous efforts he has made to right the wrong he committed and help bring justice to this serious matter.

**CONCLUSION**

For the foregoing reasons, Mr. Abdulaziz respectfully requests that the Court impose a sentence substantially below the Guidelines and the five-year maximum sentence.  Such a sentence is "sufficient but not greater than necessary" to comply with the purposes of sentencing.  18 U.S.C. § 3553(a).

Dated:      April 3, 2025                    Respectfully submitted,
            New York, NY

                                             AGNIFILO INTRATER LLP

                                             By: _____
                                             Marc Agnifilo
                                             Zach Intrater
                                             445 Park Avenue, 7th Floor
                                             New York, NY 10022
                                             (646) 205-4350
                                             marc@agilawgroup.com

                                             *Counsel for Defendant*
                                             *Aamer Abdulaziz Ahmed Salman*